FILED

APR 1 0 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATES DISTRICT COURT

# NORTHERN ~~DISTRICT~~ OF CALIFORNIA

'ABDULLAH W. MUSTAFAA,
      Petitioner   ,

      v.

D. K. SISTO, WARDEN
<u>          Respondent      /</u>

CASE NO.# CV 07 6488 CW (PR)

**MOTION FOR JUDICIAL NOTICE**

In compliance with Federal Rules Of Evidence 201(d) "Judicial Notice of Adjudicative Facts" Petitioner hereby moves this honorable court to take Judicial Notice to the court's holdings in the strikingly similar case of <u>Williams v. Roe</u> (9th Cir: 2005) 421 F 3d 883, 887-888, (*see attached as exhibit 'A'*). Therein the court held "Because the amended statute [here, state Supreme Court case law] removed the judge's discretion to impose a lighter sentence, applying it to <u>Williams</u> violated the ex-post Facto clause..."

Petitioner's claim is distinguished by all the elements found in the <u>Williams v. Roe</u>, in which the Court held that an Ex Post Facto violation had indeed occurred.

Petitioner claim is not dissimilar to <u>Williams v. Roe</u>. Petitioner herein moves this court to adopt the distinguished adjudicative facts of <u>Williams v. Roe</u>.

The Ex Post facto Clause of the US Constitution prohibits retroactive application of detrimental actions by the legislative and executive branches of government, (*see <u>Weaver v. Graham</u>, 1981, 450 US 24, <u>Brown v. Palmater</u>, 9th Cir 2004, 379 3d 1089, 1091* **and** *<u>Bouie v. City of Columbia</u> (1964) 378 US*

1

*347, 354, extended that long established principle to include unforseeable [judicial] construction of a*

*criminal statue [or precedent].*

In addition Petitioner, asks the court to take Judicial Notice to <u>Weaver v. Graham,</u> 1981 450 US 24,

<u>Brown v. Palmater</u> 9th Cir 2004, 379 F 3d 1089, 1091 and <u>Bouie v. City of Columbia</u> (1964) 378 US

347, 354 attached herein as exhibits 'B' 'C' and "D" respectively.

Petitioner also moves this honorable court in accordance with Rule 201 (e) of Federal Rules of

Evidence for the opportunity to he heard as to the propriety of taking Judicial Notice and the tenor of the

matter notice.

//

RESPECTFULLY SUBMITTED

'Abdullah W. Mustafaa                                                    March 27, 2008
aka: Terry L. Matthews
E-24447 CSP-Solano

2

## DECLARATION AND PROOF OF SERVICE BY MAIL

I, Abdullah Mustafa declare under the penalty of perjury that I am over the age of 18 years, ( **☒** ) and not a party, or ( **✗** ) am a party to this action, and reside in Solano County, at P.O. Box 4000, Cell # 3-216 ) Vacaville, California. 95696-4000.

That on march , 27 , 200 8 . I submitted to custody officials for inspection, sealing and depositing in the United States Mail, consistent with the "Mailbox Rule"; Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) at the California State Prison-Solano, Vacaville, California. 95696-4000 a copy of the attached hereof:

"Motion For Judicial notice"

in a fully prepaid envelope, addressed to:

California attorney General
455 Golden Gate ave
S.F. CA 94102

I declare under the penalty of perjury that the foregoing is true and correct. This declaration was executed on this march , 27 , 200 8 , at CSP-Solano, Vacaville, California. 95696-4000.



DECLARANT

# EXHIBIT

# 'A'

Citation/Title
421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

**\*883**   421 F.3d 883

5 Cal. Daily Op. Serv. 7602

United States Court of Appeals,
Ninth Circuit.

**Chris Francis WILLIAMS, Petitioner-Appellant,**

v.

**Ernest ROE, Warden, Respondent-Appellee.**

**No. 03-56064.**
Argued and Submitted Oct. 7, 2004.

Filed Aug. 24, 2005.

**Background:** Petitioner convicted in state court of robbery and kidnapping for robbery, and sentenced to two consecutive life imprisonment terms with the possibility of parole and one consecutive 11-year and four-month term filed petition for writ of habeas corpus. The United States District Court for the Central District of California, Manuel L. Real, J., denied petition. Petitioner appealed.

**Holdings:** The Court of Appeals, Tashima, Circuit Judge, held that:

(1) application of amended California statute, requiring that the sentencing court impose the highest penalty when multiple convictions were based on the same act, violated ex post facto clause, and

(2) petitioner was not required to establish harm or prejudice from ex post facto violation.

Reversed and remanded.

West Headnotes

[1]  Habeas Corpus ☞842

197 ----
    197III Jurisdiction, Proceedings, and Relief
      197III(D) Review
        197III(D)2 Scope and Standards of Review

© 2007 Thomson/West. No claim to original U.S. Govt. works.

421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

197k842 Review De Novo.

  The Court of Appeals reviews de novo a district court's denial of a habeas petition.  28 U.S.C.A. § 2254.

[2]  Constitutional Law ☞203

      92 ----
          92VIII Retrospective and Ex Post Facto Laws
              92k198 Retroactive Operation of Ex Post Facto Laws
                  92k203 Nature or Extent of Punishment.

      [See headnote text below]

[2]  Sentencing and Punishment ☞506

      350H ----
          350HIII Sentence on Conviction of Different Charges
              350HIII(A) In General
                  350Hk502 Constitutional, Statutory, and Regulatory Provisions
                      350Hk506 Retroactive Operation.

  Application of amended California statute, requiring that the sentencing court impose the highest penalty when multiple convictions were based on the same act, to defendant convicted of robbery and kidnapping for robbery, arising from same criminal act, violated the ex post facto clause, where version of statute in effect when crimes were committed gave sentencing court discretion to impose sentence for either crime of conviction.  U.S.C.A. Const. Art. 1, § 9, cl. 3; West's Ann.Cal.Penal Code § 654.

[3]  Criminal Law ☞1162

      110 ----
          110XXIV Review
              110XXIV(Q) Harmless and Reversible Error
                  110k1162 Prejudice to Rights of Party as Ground of Review.

  A trial-type constitutional error is "harmless," unless it has a substantial and injurious effect or influence in determining the jury's verdict.

[4]  Criminal Law ☞1162

      110 ----
          110XXIV Review
              110XXIV(Q) Harmless and Reversible Error
                  110k1162 Prejudice to Rights of Party as Ground of Review.

  An ex post facto violation is not a trial-type constitutional error subject to harmless error analysis.  U.S.C.A. Const. Art. 1, § 9, cl. 3.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

[5]  Habeas Corpus ☞503.1

   197 ----
      197II Grounds for Relief;  Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
         197k503 Judgment, Sentence, or Order
            197k503.1 In General.

   Petitioner was not required to establish harm or prejudice from an ex post facto violation resulting from state court's application of amended sentencing statute, as a precondition for habeas relief.  U.S.C.A. Const. Art. 1, § 9, cl. 3 ;  28 U.S.C.A. § 2254.

   **884** Diane E. Berley, West Hills, CA, for the petitioner-appellant.

   Alana R. Cohen Butler, Deputy Attorney General, San Diego, CA, for the respondent-appellee.

   Appeal from the United States District Court for the Central District of California, Manuel L. Real, District Judge, Presiding.  D.C. No. CV 02-0351 R.

   Before PREGERSON, TASHIMA, and PAEZ, Circuit Judges.

   TASHIMA, Circuit Judge.

   Appellant Chris Francis Williams appeals the district court's denial of his petition for writ of habeas corpus.  Williams challenges under the *Ex Post Facto* Clause the state court's application of an amended version of California Penal Code § 654.  The amended statute eliminated judicial discretion to impose a lower sentence afforded by the version in place at the time of Williams' offense.  We hold that application of the amended statute was an *ex post facto* violation.

   Further, under our case law, such an error requires reversal without inquiring into its harmfulness.  We therefore conditionally grant the writ of habeas corpus and remand.

### FACTS

   The indictment against Williams contained nine counts based on three separate incidents.  Counts 1 and 2 (robbery) and counts 3, 4, and 5 (kidnaping for robbery) stemmed from a June 1996 incident at a Kragen Auto Parts Store in San Bernardino.  Williams entered the store, pointed a gun at the clerk, and stated "This is a robbery" and "Give me all the money."  After the clerk put money into a box, Williams instructed another employee to carry the box and forced him and two other employees to accompany Williams approximately 200 yards to a parking lot.  Williams then took the box and ordered the employees to walk back to the store.

   **885** Count 6 (robbery) and counts 7 and 8 (kidnaping for robbery) were based

© 2007 Thomson/West. No claim to original U.S. Govt. works.

421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

on a July 1996 incident at a San Bernardino Radio Shack. Williams showed a gun to two men working at the store and told them it was a robbery. One of the two employees put money from the register into a box and, at Williams' direction, the two accompanied him approximately 200 hundred feet down the street. Williams then took the box from the employee holding it and instructed the two to return to the store.

An August 1996 incident gave rise to count 9 of the indictment (robbery). Williams entered a Redlands Kragen Auto Parts store, pointed a gun at the clerk, and directed him to open the safe. The clerk placed money from the safe into a box, handed it to Williams, and let Williams out of the store.

## PROCEDURAL BACKGROUND

Williams was convicted in San Bernardino County Superior Court on four counts of robbery and five counts of kidnaping for robbery. The court sentenced him to two consecutive life terms and a consecutive determinate term of 27 years. On appeal, the California Court of Appeal held that the trial court violated California Penal Code § 654, by imposing separate sentences for robbery and kidnaping for robbery convictions based on the same act. The Court of Appeal stayed the sentence on the pertinent robbery counts, which carried lower penalties than the corresponding kidnaping counts, and affirmed the rest of the judgment. The trial court then modified Williams' sentence to two life sentences with possibility of parole plus 11 years and four months. The court sentenced Williams under the amended version of § 654, which provided that an act punishable under different provisions of law could only be punished under one of those provisions. The amended statute also required the court to impose the sentence for the count carrying a higher sentence when multiple counts were based on the same act. The California Supreme Court denied Williams' petition for review. The San Bernardino County Superior Court subsequently denied Williams' petition for a writ of habeas corpus. He then filed a habeas petition in the Court of Appeal, which was also denied. The California Supreme Court also denied a subsequent habeas petition.

Williams then filed this federal habeas petition, which the district court denied. Williams filed a timely notice of appeal, but the district court denied Williams a certificate of appealability ("COA"). We subsequently issued a COA limited to the question of whether the state trial court's application of the amended version of California Penal Code § 654, violated Williams' rights under the *Ex Post Facto* clause.

## ANALYSIS

[1] We review de novo a district court's denial of a 28 U.S.C. § 2254 habeas petition. *Campbell v. Rice*, 408 F.3d 1166, 1169 (9th Cir.2005). Because Williams' federal petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA's provisions apply. *Id.* The AEDPA limits a federal habeas court's review of a state court's decision to determining whether it was: "(1) contrary to, or

421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at 1170(quoting 28 U.S.C. § 2254(d)(1)-(2)) (internal quotation marks omitted); *see Lockyer v. Andrade,* 538 U.S. 63, 70-73, 123 S.Ct. 1166, 155 L.Ed.2d **886** 144 (2003) To view preceding link please click here (explaining this standard). The question in Williams' case is whether, at the time the state trial court imposed sentence under the amended version of § 654, the holdings of the Supreme Court established governing legal principles dictating that it do otherwise. *See Andrade,* 538 U.S. at 71-72, 123 S.Ct. 1166.

## I. *Ex Post Facto* Violation

When the state court resentenced Williams, the Supreme Court had considered the application of the *Ex Post Facto* Clause to state statutes in two cases similar to this one. In *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), the Court found an *ex post facto* violation because the petitioners had been sentenced under a law making mandatory what had been the maximum term for their offense when they committed the crime. The *Lindsey* petitioners were convicted of grand larceny. *Id.* at 397, 57 S.Ct. 797. At the time of the offense, the penalty for grand larceny was imprisonment for not more than 15 years. *Id.* at 397-98, 57 S.Ct. 797. The statute permitted the imposition of a sentence up to the maximum term and also set a minimum sentence of not less than six months or more than five years. *Id.* at 398, 57 S.Ct. 797. Once the prescribed minimum sentence elapsed, a parole board could order the prisoner released on parole. *Id.* A statute enacted after commission of the offense, but before petitioners' sentencing, required the judge to impose the maximum term provided by law. *Id.* It also empowered the parole board to determine the length of each prisoner's confinement up to the maximum term. *Id.* at 398-99, 57 S.Ct. 797. Thus, under the law in effect at the time of the offense, the petitioners could have been sentenced to a maximum term of less than 15 years. *Id.* at 400, 57 S.Ct. 797. The intervening change in law required that they receive a 15-year sentence during which the parole board had the discretion to grant supervised release. *Id.* The *Lindsey* court reasoned that such "an increase in the possible penalty is *ex post facto,* regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier." *Id.* at 401, 57 S.Ct. 797 (citations omitted).

*Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), held a Florida statute unconstitutional as applied to a petitioner who committed his crime before its enactment. The statute diminished the number of "gain-time" credits that prisoners could earn for good behavior. *Id.* at 25-26, 101 S.Ct. 960. Such credits reduced the portion of a prisoner's sentence that he would be required to serve. *Id.* In finding an *ex post facto* violation, *Weaver* identified two critical elements of an *ex post facto* law: "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Id.* at 29, 101 S.Ct. 960. The court reasoned that the statute substantially altered the consequences attached to the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

petitioner's already-completed crime and that it disadvantaged him by lengthening the time he would have to stay in prison.  *Id.* at 33, 101 S.Ct. 960.

The reasoning of *Lindsey* and *Weaver* dictate application of the version of § 654 in effect when Williams committed his crimes.  (FN1)  In March 2000, the trial court  **\*887**  resentenced Williams under the amended version of § 654, which provided that:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Cal. Pen.Code § 654 (2000). At the time Williams committed his crimes, § 654 provided that:  "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one."  Cal. Pen.Code § 654 (1996).

[2] Under the earlier version of § 654, the trial court had the discretion to sentence Williams for either of two crimes he was convicted of based on the same act, *i.e.*, robbery or kidnaping for robbery.  By contrast, the amended version of the statute required the trial court to sentence him for the crime carrying the higher penalty.  Because the amended statute removed the judge's discretion to impose a lighter sentence, applying it to Williams violated the *Ex Post Facto* Clause under *Lindsey,* 301 U.S. at 401, 57 S.Ct. 797, and *Weaver,* 450 U.S. at 29, 101 S.Ct. 960.   The state trial court's application of the amended version of § 654 was thus contrary to clearly established Supreme Court precedent.

## II. Applicability of Harmless Error Analysis

[3][4] The State argues that the *ex post facto* violation resulting from application of the amended version of § 654 was harmless error.  It suggests that we should apply the *Brecht* standard of harmless error review, determining whether the *ex ipost facto* error had a "substantial and injurious effect" on the judgment.  *See Brecht v. Abrahamson,* 507 U.S. 619, 632 n. 7, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).  Under the *Brecht* standard, a trial-type constitutional error is harmless unless it has a "substantial and injurious effect or influence in determining the jury's verdict."  *Id.* The *ex post facto* error at issue here, however, occurred at sentencing--not during trial--when the court applied the amended version of § 654.  It is thus not a trial-type error that would affect a jury's verdict.  Accordingly, we reject the State's contention that an *ex post facto* violation is a "trial-type" error subject to *Brecht* harmless error analysis.  (FN2)

**\*888**  We turn, instead, to our case law which specifically addresses *ex post facto* violations.  The Supreme Court has noted that "[t]he proper relief upon a conclusion that a state prisoner is being treated under an *ex post facto* law is to remand to permit the state court to apply, if possible, the law in place when his crime occurred."  *Weaver,* 450 U.S. at 36 n. 22, 101 S.Ct. 960; *see also Murtishaw v. Woodford,* 255 F.3d 926, 967(9th Cir.2001).  In *Murtishaw,* after concluding that "[t]aking discretion away from a sentencer violates the *Ex Post Facto* clause," *id.* at 965, we reversed the petitioner's death sentence and

© 2007 Thomson/West. No claim to original U.S. Govt. works.

421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

remanded for resentencing under the proper statute. *Id.* at 967, 974. We did not apply harmless error analysis to the *ex post facto* violation. (FN3) *Id.*

[5] Thus, in *Murtishaw,* we implicitly concluded that an *ex post facto* sentencing violation which results in taking away the sentencer's discretion is the type of error which has a substantial and injurious effect on the sentence or, at the least, was the type of error as to which we could not determine with any degree of confidence whether it had a substantial effect on the sentence. (FN4) *Cf. O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (concluding that, with respect to trial-type error, "when a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief"); *United States v. Ameline,* 409 F.3d 1073, 1079 (9th Cir.2005) (en banc) ("Rather than affirm a sentence that was unconstitutional and may have been prejudicial, we elect to remand to the district court to answer the question whether the sentence would have been different had the court known that the Guidelines were advisory."); *id.* at 1081 (noting that "it is a miscarriage of justice to give a person an illegal sentence" (quoting *United States v. Paladino,* 401 F.3d 471, 483 (7th Cir.2005))).

Our cases following *Murtishaw* are also consistent in their view that a showing of harm or prejudice from an *ex post facto* violation is not required as a precondition to habeas relief. *See Brown v. Palmateer,* 379 F.3d 1089, 1091, 1096 (9th Cir.2004) (holding that postponement of a habeas petitioner's parole date pursuant to a statutory amendment enacted after the commission of his crime violated the *Ex Post Facto* Clause and, accordingly, reversing the denial of his habeas petition without conducting a harmless error analysis); *Hunter v. Ayers,* 336 F.3d 1007, 1011-13 (9th Cir.2003) (holding that the application of an amended prison regulation to deny restoration of good time credits constituted an *ex post facto* violation and affirming habeas relief without conducting a harmless error analysis); *Himes v. Thompson,* 336 F.3d 848, 864 (9th Cir.2003) (concluding that an *ex post facto* violation occurred when the parole board subjected a habeas petitioner to parole regulations that were more onerous than those in place at the time he committed his offense and granting habeas relief without conducting a harmless error analysis). In short, given **\*889.** an *ex post facto* sentencing violation, our case law is clear and consistent that Williams is entitled to habeas relief.

CONCLUSION

The district court's denial of Williams' petition for a writ of habeas corpus is reversed and the case is remanded to the district court with instructions to grant the writ, unless the State resentences Williams under the applicable version of § 654 within a reasonable period of time to be determined by the district court.

**REVERSED and REMANDED.**

(FN1.) While conceding that a "technical" *ex post facto* violation occurred, the State suggests that *Lindsey* was not "clearly established" federal law at the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

421 F.3d 883, Williams v. Roe, (C.A.9 (Cal.) 2005)

time of sentencing because its "viability has been questioned," citing *Barnes v. Scott*, 201 F.3d 1292, 1294-95 (10th Cir.2000). *Barnes* refers to a footnote in the Supreme Court's opinion in *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), which states:

Our opinions in *Lindsey, Weaver,* and *Miller* suggested that enhancements to the measure of criminal punishment fall within the *ex post facto* prohibition because they operate to the "disadvantage" of covered offenders. But that language was unnecessary to the results in those cases and is inconsistent with the framework developed in *Collins v. Youngblood.* After *Collins,* the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of "disadvantage," nor, as the dissent seems to suggest, on whether an amendment affects a prisoner's "*opportunity* to take advantage of provisions for early release," but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

*Id.* at 506 n. 3, 115 S.Ct. 1597 (citations omitted). *Morales,* however, did not overrule *Lindsey* and *Weaver,* but distinguished them by pointing out that the laws there at issue "had the purpose and effect of enhancing the range of available prison terms." *Id.* at 507, 115 S.Ct. 1597.

(FN2.) The Supreme Court has also identified a narrow category of constitutional errors that is not subject to harmless error analysis. *See Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (noting that structural errors requiring automatic reversal include: a complete denial of counsel; a biased trial judge; racial discrimination in the selection of a grand jury; denial of self-representation at trial; denial of a public trial; and a defective reasonable doubt instruction). But just as the *ex post facto* violation here cannot be categorized as a "trial-type" error, it also cannot be categorized as a "structural" error which affects the structure of a trial.

(FN3.) We did, however, apply *Brecht* harmless error analysis to a jury instruction error resulting from application of the *ex post facto* statute, identifying jury instruction error as a "trial-type error that occurred during the presentation of the case to the jury." *Murtishaw,* 255 F.3d at 973.

(FN4.) We also note that the State's countervailing interest in finality is much less weighty with respect to resentencing, as opposed to retrial, at least in the non-capital context.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

# EXHIBIT 'B'

[450 US 24]
HOYT WEAVER, Petitioner,

v

ROBERT GRAHAM, Governor of Florida

450 US 24, 67 L Ed 2d 17, 101 S Ct 960

[No. 79–5780]

Argued November 5, 1981. Decided February 24, 1981.

**Decision:** State statute reducing amount of "gain time" deductable from convicted prisoner's sentence, held unconstitutional as ex post facto law as applied to person whose crime was committed before statute's enactment.

### SUMMARY

A state prisoner whose opportunity to reduce the length of his prison term through the accumulation of "gain time" for good conduct had been restricted by a state statute enacted after his crime was committed sought a writ of habeas corpus from the Supreme Court of Florida on the ground that the new statute as applied to him was an ex post facto law prohibited by the United States and the Florida Constitutions. The Supreme Court of Florida summarily denied the petition, relying on its earlier decision in which it reasoned that gain time allowance is an act of grace rather than a vested right and may be withdrawn, modified, or denied.

On certiorari, the United States Supreme Court reversed. In an opinion by MARSHALL, J., joined by BRENNAN, STEWART, WHITE, POWELL, and STEVENS, JJ., it was held that the state statute was unconstitutional as an ex post facto law as applied to the prisoner, since the statute was retrospective in that it attached legal consequences to acts completed before its effective date, and was disadvantageous to the prisoner in that it lengthened the period that he must spend in prison, despite the facts that gain time may not have technically been part of the prisoner's sentence and that other statutory provisions were also enacted whereby a prisoner might earn extra gain time by satisfying extra conditions beyond mere good conduct.

BLACKMUN, J., joined by BURGER, Ch. J., concurring in the judgment, expressed the view that he would affirm the judgment of the Supreme Court

Briefs of Counsel, p 829, infra.

U.S. SUPREME COURT REPORTS                67 L Ed 2d

of Florida, on the ground that the challenged statute operated only prospectively and did not affect the prisoner's "sentence," were he not constrained by the United States Supreme Court's precedents.

REHNQUIST, J., concurring in the judgment, emphasized that the new and old statutory provisions as to gain time should be compared in toto to determine if the new may be fairly characterized as more onerous than the old, and that while the new provision in this case was more onerous than the old, this does not mean that no reduction in automatic gain time, however slight, can ever be offset by increases in the availability of discretionary gain time, however great, or that reductions in the amount of credit for good conduct can never be offset by increases in the availability of credit which can be earned by more than merely good conduct.

## HEADNOTES

Classified to U.S. Supreme Court Digest, Lawyers' Edition

**Constitutional Law § 83 — ex post facto laws — reduction of prisoner's "gain time"**

1a-1c. A state statute repealing an earlier statute and reducing the amount of "gain time" which can be deducted from a convicted prisoner's sentence is unconstitutional as an ex post facto law (Art I, § 10, cl 1) as applied to an individual whose crime was committed before the statute's enactment, the statute being retrospective in that it attached legal consequences to acts completed before its effective date and being disadvantageous to the individual in that it lengthened the period that he must spend in prison, the fact that gain time may not have technically been part of the individual's sentence being irrelevant since it was conceded to be one determinant of the prisoner's term, and the fact that other statutory provisions were also enacted whereby a prisoner might earn extra gain time by satisfying extra conditions being immaterial since the award of such gain time was purely discretionary,

## TOTAL CLIENT-SERVICE LIBRARY® REFERENCES

16 Am Jur 2d, Constitutional Law § 643

13 Am Jur Pl & Pr Forms (Rev), Habeas Corpus, Forms 42–43.2 and 81

USCS, Constitution, Article I, Section 10, Clause 1

US L Ed Digest, Constitutional Law § 83

L Ed Index to Annos, Constitutional Law

ALR Quick Index, Ex Post Facto Laws

Federal Quick Index, Ex Post Facto Laws

## ANNOTATION REFERENCES

Supreme Court's views as to what constitutes an ex post facto law prohibited by Federal Constitution. 53 L Ed 2d 1146.

Withdrawal, forfeiture, modification, or denial of good-time allowance to prisoner. 95 ALR2d 1265.

## WEAVER v GRAHAM
450 US 24, 67 L Ed 2d 17, 101 S Ct 960

contingent on both the correctional authorities' wishes and the inmate's special behavior, and therefore unable to compensate for the reduction of gain time available solely for good conduct.

### Constitutional Law § 83 — ex post facto laws — changing punishment

2. The Constitution's ex post facto prohibitions (Art I, § 9, cl 3; Art I, § 10, cl 1) forbid the Congress and the states from enacting any law which imposes a punishment for an act which is not punishable at the time it was committed, or imposes additional punishment to that then prescribed.

### Constitutional Law § 68.5; Courts § 121 — ex post facto laws — separation of powers

3a, 3b. The Constitution's ex post facto prohibitions (Art I, § 9, cl 3; Art I, § 10, cl 1) uphold the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law.

### Constitutional Law § 73 — ex post facto laws

4. To be ex post facto, a criminal or penal law must be retrospective in that it must apply to events occurring before its enactment and it must disadvantage the offender affected by it, but it need not impair a "vested right."

### Constitutional Law § 79 — ex post facto laws — alteration of a substantial right

5a, 5b. Although no ex post facto violation occurs if the change effected by a law is merely procedural, an alteration of a substantial right is not merely procedural, even if the statute takes a seemingly procedural form.

### Constitutional Law § 83 — ex post facto laws — change in punishment

6. Critical to relief under the ex post facto clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.

### Constitutional Law § 83 — ex post facto laws — change from discretionary to mandatory sentence — imposition of greater punishment

7a, 7b. In the context of ex post facto analysis, a law may meet the requirement that it be retrospective not only if it alters the length of the sentence, but also if it changes the maximum sentence from discretionary to mandatory; the critical question is whether the new provision imposes greater punishment after the commission of the offense, not merely whether it increases a criminal sentence.

### Courts § 912 — ex post facto laws — whether statute has adverse effect — federal question

8. For purposes of examining a retrospective state criminal statute's validity in light of the Constitution's ex post facto prohibition (Art I, § 10, cl 1), whether the statute ameliorates or worsens conditions imposed by its predecessor, and is therefore, respectively, valid or invalid, is a federal question.

### Constitutional Law § 76 — ex post facto laws — requirement of disadvantage to offender

9. To determine whether a law meets the requirement that it disadvantage the offender affected by it for purposes of ex post facto analysis, the inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual.

### Appeal and Error § 1692.2 — ex post facto laws — proper relief

10a, 10b. The proper relief for the United States Supreme Court to provide upon concluding that a state prisoner is being treated under an ex post facto law is to remand to permit the state court to apply, if possible, the law in place when his crime occurred, any severable provisions of the statute containing such law which are not ex post facto still being applicable to such prisoner.

**19**

## SYLLABUS BY REPORTER OF DECISIONS

*Held:* A Florida statute repealing an earlier statute and reducing the amount of "gain time" for good conduct and obedience to prison rules deducted from a convicted prisoner's sentence is unconstitutional as an ex post facto law as applied to petitioner, whose crime was committed before the statute's enactment.

(a) For a criminal or penal law to be ex post facto, it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it. Lindsey v Washington, 301 US 397, 401, 81 L Ed 1182, 57 S Ct 797; Calder v Bull, 3 Dall 386, 390, 1 L Ed 648. It need not impair a "vested right." Even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Ex Post Facto Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.

(b) The effect, not the form, of the law determines whether it is ex post facto. Although the Florida statute on its face applies only after its effective date, respondent conceded that the statute is used to calculate the gain time available to prisoners, such as petitioner, convicted for acts committed before the statute's effective date. Regardless of whether or not the prospect of gain time was in some technical sense part of the petitioner's sentence, the statute substantially alters the consequences attached to a crime already completed, changing the quantum of punishment, and thus is a retrospective law which can be constitutionally applied to petitioner only if it is not to his detriment.

(c) The Florida statute is disadvantageous to petitioner and other similarly situated prisoners. The reduction in gain time that had been available under the repealed statute for abiding by prison rules and adequately performing assigned tasks lengthens the period that someone in petitioner's position must spend in prison. It is immaterial that other statutory provisions were also enacted whereby a prisoner might earn extra gain time by satisfying extra conditions. The award of such extra gain time is purely discretionary, contingent on both the correctional authorities' wishes and the inmate's special behavior, and thus none of the provisions for extra gain time compensates for the reduction of gain time available solely for good conduct. The new provision therefore constricts the inmate's opportunity to earn early release and thereby makes more onerous the punishment for crimes committed before its enactment.

376 So 2d 855, reversed and remanded.

Marshall, J., delivered the opinion of the Court, in which Brennan, Stewart, White, Powell, and Stevens, JJ., joined. Blackmun, J., filed an opinion concurring in the judgment, in which Burger, C. J., joined. Rehnquist, J., filed an opinion concurring in the judgment.

### APPEARANCES OF COUNSEL

**Thomas C. MacDonald, Jr.,** argued the cause for petitioner.
**Wallace E. Allbritton** argued the cause for respondent.
Briefs of Counsel, p 829, infra.

### OPINION OF THE COURT

[450 US 25]
Justice **Marshall** delivered the opinion of the Court.

[1a] Florida, like many other States, rewards each convicted prisoner for good conduct and obedience to prison rules by using a statutory formula that reduces the portion of his sentence that he must serve. In this case, we consider whether a Florida statute altering the availability of such "gain time for good

20

## WEAVER v GRAHAM
### 450 US 24, 67 L Ed 2d 17, 101 S Ct 960

conduct"[1] is unconstitutional as an ex post facto law when applied to petitioner, whose crime was committed before the statute's enactment.

I

The relevant facts are undisputed. Petitioner pleaded guilty to second-degree murder. The crime charged occurred on January 31, 1976. On May 13, 1976, petitioner was convicted and sentenced to a prison term of 15 years, less time

[450 US 26]

already served. The State statute in place on both the date of the offense and the date of sentencing provided a formula for deducting gain time credits from the sentences "of every prisoner who has committed no infraction of the rules or regulations of the division, or of the laws of the state, and who has performed in a faithful, diligent, industrious, orderly and peaceful manner, the work, duties and tasks assigned to him." Fla Stat § 944.27(1) (1975).[2] According to the formula, gain time credits were to be calculated by the month and were to accumulate at an increasing rate the more time the prisoner had already served. Thus, the statute directed that the authorities "shall grant the following deductions" from a prisoner's sentence as gain-time for good conduct:

"(a) Five days per month off the first and second years of his sentence;

"(b) Ten days per month off the third and fourth years of his sentence; and

"(c) Fifteen days per month off the fifth and all succeeding years of his sentence." Fla Stat § 944.27(1) (1975).

In 1978, the Florida legislature repealed § 944.27(1) and enacted a new formula for monthly gain time-deductions. This new statute provided:

"(a) Three days per month off the first and second years of the sentence;

"(b) Six days per month off the third and fourth years of the sentence; and

"(c) Nine days per month off the fifth and all succeeding years of the sentence." Fla Stat § 944.275(1) (1979).[3]

[450 US 27]

The new provision was implemented on January 1, 1979, and since

---

1. Fla Stat § 944.275(1) (1979); Fla Stat § 944.27(1) (1975). At the time of petitioner's offense, Florida used the term "good-time," to refer to extra "allowance for meritorious conduct or exceptional industry." Fla Stat § 944.29 (1975). The current Florida law adopts the phrase "gain-time" to apply to various kinds of time credited to reduce a prisoner's prison term. See, e.g., Fla Stat § 944.275(3) (1979).

2. The statute also provided for extra discretionary good time, based on other factors. See n 18, infra.

3. There are some minor language differences in the new provision directing the correctional authorities at the Department of Offender Rehabilitation to make the gain-time deductions. The phrase "who has performed in a satisfactory and acceptable manner the work, duties, and tasks assigned," Fla Stat § 944.275(1) (1979), replaces the former phrase, "who has performed in a faithful, diligent, industrious, orderly and peaceful manner the work, duties, and tasks assigned," Fla Stat § 944.27(1) (1975). The new version also explicitly adds that the deductions are to be made "on a monthly basis, as earned," which appears to codify the previous practice. The State Supreme Court assigned no significance to these differences in evaluating the ex post facto claim, nor does any party here assert that these minor language changes are relevant to our inquiry.

21

that time the State has applied it not only to prisoners sentenced for crimes committed since its enactment in 1978, but also to all other prisoners, including petitioner, whose offenses took place before that date.[4]

Petitioner, acting pro se, sought a writ of habeas corpus from the Supreme Court of Florida on the ground that the new statute as applied to him was an ex post facto law prohibited by the United States and the Florida Constitutions.[5] He alleged that the reduced accumulation of monthly gain-time credits provided under the new statute would extend his required time in prison by over 2 years, or approximately 14 percent of his original 15-year sentence.[6] The State Supreme

[450 US 28]

Court summarily denied the petition. 376 So 2d 855. The court relied on its decision in a companion case raising the same issue where it reasoned that "gain time allowance

is an act of grace rather than a vested right and may be withdrawn, modified, or denied." Harris v Wainwright, 376 So 2d 855, 856 (1979).[7] We granted certiorari, 445 US 927, 63 L Ed 2d 759, 100 S Ct 1311, and we now reverse.

II

[2, 3a] The ex post facto prohibition[8] forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Cummings v Missouri, 4 Wall 277, 325–326, 18 L Ed 356 (1867). See Lindsey v Washington, 301 US 397, 401, 81 L Ed 1182, 57 S Ct 797 (1937); Rooney v North Dakota, 196 US 319, 324–325, 49 L Ed 494, 25 S Ct 264 (1905); In re Medley, 134 US 160, 171, 33 L Ed 835, 10 S Ct 384 (1980); Calder v Bull, 3 Dall 386, 390, 1 L Ed 648 (1798).[9]

---

4. No saving clause limiting the Act's application was included. 1978 Fla Laws, ch 78-304. In applying the new schedule to prisoners like petitioner, the Secretary of the Department of Offender Rehabilitation relied on the legal opinion of the Attorney General of Florida. Fla Op Atty Gen 078-96 (1978).

5. "No State shall . . . pass any . . . ex post facto Law." U. S. Const, Art I, § 10, cl 1. The Florida Constitution similarly provides that "[n]o . . . ex post facto law . . . shall be passed." Fla Const, Art I, § 10. See also Fla Const, Art X, § 9 (forbidding state legislature to enact a statute "affect[ing] [the] prosecution or punishment" for any offense previously committed).

6. Petitioner estimated that his "tentative expiration date" under Fla Stat § 944.27 (1975) would be December 31, 1984. App 15a. The State calculated that application of the new gain-time provision starting with its effective date resulted in a projected release date of February 2, 1987. Id., at 12a–13a. The State does not dispute petitioner's contention that a difference of over two years is at stake.

7. The Florida court also distinguished

cases from other jurisdictions striking down retrospective statutes that eliminated the allowance of gain time in specified situations, revised the entire scheme of criminal penalties, and extended the incarceration of juvenile offenders. 376 So 2d, at 857 (distinguishing Dowd v Sims, 229 Ind 54, 95 NE2d 628 (1950); Goldsworthy v Hannifin, 86 Nev 252, 468 P2d 350 (1970); In re Dewing, 19 Cal 3d 54, 560 P2d 375 (1977); and In re Valenzuela, 275 Cal App 2d 483, 79 Cal Rptr 760 (1969)).

8. U. S. Const, Art I, § 9, cl 3; Art I, § 10, cl 1. "So much importance did the [C]onvention attach to [the ex post facto prohibition], that it is found twice in the Constitution." Kring v Missouri, 107 US 221, 227, 27 L Ed 506, 2 S Ct 443 (1883).

9. "The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty" after the fact. Calder v Bull, 3 Dall, at 397, 1 L Ed 648 (Paterson, J.). See also Fletcher v Peck, 6 Cranch 87, 138, 3 L Ed 162 (1810). ("An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed").

WEAVER v GRAHAM
450 US 24, 67 L Ed 2d 17, 101 S Ct 960

Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly [450 US 29] changed. Dobbert v Florida, 432 US 282, 298, 53 L Ed 2d 344, 97 S Ct 2290 (1977); Kring v Missouri, 107 US 221, 229, 27 L Ed 506, 2 S Ct 443 (1883); Calder v Bull, supra, at 387, 1 L Ed 648. The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation. Malloy v South Carolina, 237 US 180, 183, 59 L Ed 905, 35 S Ct 507 (1915); Kring v Missouri, supra, at 229, 27 L Ed 506, 2 S Ct 443; Fletcher v Peck, 6 Cranch 87, 138, 3 L Ed 162 (1810); Calder v Bull, supra, at 395, 396 1 L Ed 648 (Paterson, J.); the Federalist No. 44 (J. Madison); No. 84 (A. Hamilton).[10]

[4, 5a, 6] In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment,[11] and it must disadvantage the offender affected by it.[12] Lindsey v Washington, supra, at 401, 81 L Ed 1182, 57 S Ct 797; Calder v Bull, supra, at 390, 1 L Ed 648. Contrary to the reasoning of the Supreme Court of Florida, a law need not impair a "vested right" to violate the ex post facto prohibition.[13] Evaluating

---

10. [3b] The ex post facto prohibition also upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law. Cf. Ogden v Blackledge, 2 Cranch 272, 277, 2 L Ed 276 (1804).

11. See Jaehne v New York, 128 US 189, 194, 32 L Ed 398, 9 S Ct 70 (1888) (portion of legislation void which " 'should endeavor to reach by its retroactive operation acts before committed' ") (quoting T. Cooley, Constitutional Limitations 215 (5th ed 1883)).

12. [5b] We have also held that no ex post facto violation occurs if the change effected is merely procedural, and does "not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt." Hopt v Utah, 110 US 574, 590, 28 L Ed 262, 4 S Ct 202 (1884). See Dobbert v Florida, 432 US 282, 293, 53 L Ed 2d 344, 97 S Ct 2290 (1977). Alteration of a substantial right, however, is not merely procedural, even if the statute takes a seemingly procedural form. Thompson v Utah, 170 US 343, 354–355, 42 L Ed 1061, 18 S Ct 620 (1898); Kring v Missouri, supra, at 232, 27 L Ed 506, 2 S Ct 443.

13. In using the concept of vested rights, Harris v Wainwright, 376 So 2d, at 856, the Florida court apparently drew on the test for evaluating retrospective laws in a civil context. See 2 C. Sands, Sutherland on Statutory Construction § 41.06 (4th ed 1973); Hochman,

The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv L Rev 692, 696 (1960); Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn L Rev 775, 782 (1936). Discussion of vested rights has seldom appeared in ex post facto analysis, as in identifying whether the challenged change is substantive rather than procedural. Hopt v Utah, supra, at 590, 28 L Ed 262, 4 S Ct 202. When a court engages in ex post facto analysis, which is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred, it is irrelevant whether the statutory change touches any vested rights. Several state courts have properly distinguished vested rights from ex post facto concerns. E.g., State v Curtis, 363 So 2d 1375, 1379, 1382 (La 1978); State ex rel. Woodward v Board of Parole, 155 La 699, 700, 99 So 534, 535–536 (1924); Murphy v Commonwealth, 172 Mass 264, 272, 52 NE 505, 507 (1899).

Respondent here advances several theories that incorporate the vested rights approach. For example, respondent defends Fla Stat § 944.275 (1) (1979) on the ground that it does not take away any gain time that petitioner has already earned. Brief for Respondent 39–40. Although this point might have pertinence were petitioner alleging a due process violation, see Wolff v McDonnell, 418 US 539, 41 L Ed 2d 935, 94 S Ct 2963, 71 Ohio Ops 2d 336 (1974), it has no relevance to his ex post facto claim.

23

whether a right has vested
[450 US 30]
is important for claims under the Contracts or Due Process Clause, which solely protect pre-existing entitlements. See, e.g., Wood v Lovett, 313 US 362, 371, 85 L Ed 1404, 61 S Ct 983 91941); Dodge v Board of Education, 302 US 74, 78–79, 82 L Ed 57, 58 S Ct 98 (1937). See also United States Railroad Retirement Board v Fritz, 449 US 166, 174, 66 L Ed 2d 368, 101 S Ct 453 (1980). The presence or absence of an affirmative, enforceable right is not relevant, however, to the ex post facto prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of
[450 US 31]
the offense.[14] We now consider the Florida statute in light of these two considerations.

A

[1b] The respondent maintains that Florida's 1978 law altering the availability of gain time is not retrospective because on its face, it applies only after its effective date. Brief for Respondent 12, 15–16. This argument fails to acknowledge that it is the effect, not the form, of the law that determines whether it is ex post facto.[15] The critical question is whether the law changes the legal consequences of acts completed before its effective date. In the context of this case, this question can be recast as asking whether Fla Stat § 944.275(1) (1979) applies to prisoners convicted for acts committed before the provision's effective date. Clearly, the answer is in the affirmative. The respondent concedes that the State uses § 944.275(1), which was implemented on January 1, 1979, to calculate the gain time available to petitioner, who was convicted of a crime occurring on January 31, 1976.[16] Thus, the provision attaches legal consequences to a crime committed before the law took effect.

[7a] Nonetheless, respondent contends that the State's revised gain-time provision is not retrospective because its predecessor was "no part of the original sentence and thus no part of the punishment annexed to the crime at the time petitioner was sentenced." Brief for Respondent 12. This contention
[450 US 32]
is foreclosed by our

---

14. Durant v United States, 410 F2d 689, 691 (CA1 1969); Adkins v Bordenkircher, 262 SE2d 885, 887 (W Va 1980); Goldsworthy v Hannifin, 86 Nev, at 256–257, 468 P2d, at 352. See Murphy v Commonwealth, supra, at 272, 52 NE, at 507.

15. "The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised." Cummings v Missouri, 4 Wall 277, 325, 18 L Ed 356 (1867).

16. See App 12a–13a (Affidavit, Louie Wainwright, Secretary, Department of Corrections).

precedents. First, we need not determine whether the prospect of the gain time was in some technical sense part of the sentence to conclude that it in fact is one determinant of petitioner's prison term—and that his effective sentence is altered once this determinant is changed. See Lindsey v Washington, 301 US, at 401–402, 81 L Ed 1182, 57 S Ct 797; Greenfield v Scafati, 277 F Supp 644 (Mass 1967) (three-judge court), summarily affd, 390 US 713, 20 L Ed 2d 250, 88 S Ct 1409 (1968). See also Rodriguez v United States Parole Comm'n, 594 F2d 170 (CA7 1979) (elimination of parole eligibility held an ex post facto violation). We have previously recognized that a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed. Wolff v McDonnell, 418 US 539, 557, 41 L Ed 2d 935, 94 S Ct 2963, 71 Ohio Ops 2d 336 (1974); Warden v Marrero, 417 US 653, 658, 41 L Ed 2d 383, 94 S Ct 2532 (1974). See United States v De Simone, 468 F2d 1196 (CA2 1972); Durant v United States, 410 F2d 689, 692 (CA1 1969). Second, we have held that a statute may be retrospective even if it alters punitive conditions outside the sentence. Thus, we have

concluded that a statute requiring solitary confinement prior to execution is ex post facto when applied to someone who committed a capital offense prior to its enactment, but not when applied only prospectively. Compare In re Medley, 134 US 160, 33 L Ed 835, 10 S Ct 384 (1890), with Holden v Minnesota, 137 US 483, 34 L Ed 784, 11 S Ct 143 (1890). See also Cummings v Missouri, 4 Wall 277, 18 L Ed 356.[17]

[450 US 33]

For prisoners who committed crimes before its enactment, § 944.275(1) substantially alters the consequences attached to a crime already completed, and therefore changes "the quantum of punishment." See Dobbert v Florida, 432 US, at 293–294, 53 L Ed 2d 344, 97 S Ct 2290. Therefore, it is a retrospective law which can be constitutionally applied to petitioner only if it is not to his detriment. Id., at 294, 53 L Ed 2d 344, 97 S Ct 2290.

B

[8, 9] Whether a retrospective state criminal statute ameliorates or worsens conditions imposed by its predecessor is a federal question. Lindsey v Washington, supra, at 400, 81 L Ed 1182, 57 S Ct 797. See Malloy v South Carolina, 237 US, at 184, 59 L Ed 905, 35 S Ct 507; Roo-

---

17. [7b] Even when the sentence is at issue, a law may be retrospective not only if it alters the length of the sentence, but also if it changes the maximum sentence from discretionary to mandatory. Lindsey v Washington, 301 US 397, 401, 81 L Ed 1182, 57 S Ct 797 (1937). The critical question, as Florida has often acknowledged, is whether the new provision imposes greater punishment after the commission of the offense, not merely whether it increases a criminal sentence. Greene v State, 238 So 2d 296 (Fla 1970); Higginbotham v State, 88 Fla 26, 31, 101 So 233, 235 (1924); Herberle v P. R. O. Liquidating Co., 186 So 2d 280, 282 (Fla App 1966).

Thus in Dobbert v Florida, 432 US 282, 53 L Ed 2d 344, 97 S Ct 2290 (1977), we held there was no ex post facto violation because the challenged provisions changed the role of jury and judge in sentencing, but did not add to the "quantum of punishment." Id., 293–294, 53 L Ed 2d 344, 97 S Ct 2290. In Malloy v South Carolina, 237 US 180, 59 L Ed 905, 35 S Ct 507 (1915), we concluded that a change in the method of execution was not ex post facto because evidence showed the new method to be more humane, not because the change in the execution method was not retrospective. Id., at 185, 59 L Ed 905, 35 S Ct 507.

ney v North Dakota, 196 US, at 325, 49 L Ed 494, 25 S Ct 264. The inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual. Dobbert v Florida, supra, at 300, 53 L Ed 2d 344, 97 S Ct 2290; Lindsey v Washington, supra, at 401, 81 L Ed 1182, 57 S Ct 797; Rooney v North Dakota, supra, at 325, 49 L Ed 494, 25 S Ct 264.

[1c] Under this inquiry, we conclude § 944.275(1) is disadvantageous to petitioner and other similarly situated prisoners. On its face, the statute reduces the number of monthly gain-time credits available to an inmate who abides by prison rules and adequately performs his assigned tasks. By definition, this reduction in gain-time accumulation lengthens the period that someone in petitioner's position must spend in prison. In Lindsey v Washington, supra, at 401–402, 81 L Ed 1182, 57 S Ct 797, we reasoned that "[i]t is plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them freedom from custody and control prior to the expiration of the 15-year term." Here, petitioner is similarly disadvantaged by the reduced

[450 US 34]

opportunity to shorten his time in prison simply

through good conduct. In Greenfield v Scafati, supra, we affirmed the judgment of a three-judge District Court which found an ex post facto violation in the application of a statute denying any gain time for the first six months after parole revocation to an inmate whose crime occurred before the statute's enactment. There, as here, the inmate was disadvantaged by new restrictions on eligibility for release. In this vein, the threejudge court in Greenfield found "no distinction between depriving a prisoner of the right to earn good conduct deductions and the right to qualify for, and hence earn, parole. Each . . . materially 'alters the situation of the accused to his disadvantage.' " 277 F Supp, at 646 (quoting In re Medley, supra, at 171, 33 L Ed 835, 10 S Ct 384). See also Murphy v Commonwealth, 172 Mass 264, 52 NE 505 (1899).

Respondent argues that our inquiry should not end at this point because Fla Stat § 944.275(1) (1979) must be examined in conjunction with other provisions enacted with it. Brief for Respondent 18–26. Respondent claims that the net effect of all these provisions is increased availability of gain time deductions.[18] There can be no doubt that the legislature

[450 US 35]

intended

___

18. These other provisions permit discretionary grants of additional gain time for inmates who not only satisfy the good-conduct requirement, but who also deserve extra reward under designated categories. Under § 944.275(3)(b) (1979), "special gain-time" of 1 to 60 days "may be granted" to an "inmate who does some outstanding deed, such as the saving of a life or assisting in the recapturing of an escaped inmate." Another provision specifies that an inmate "may be granted" one to six extra gain-time days per month if he "faithfully performs the assignments given

to him in a conscientious manner over and above that which may normally be expected of him" and also either shows "his desire to be a better than average inmate" or "diligently participates in an approved course of academic or vocation study." § 944.275(3)(a). An inmate may be awarded up to one gain-time credit for labor evaluated "on the basis of diligence of the inmate, the quality and quantity of work performed, and the skill required for performance of the work." § 944.275(2)(b). Finally, for inmates unable to

26

through these provisions to promote rehabilitation and to create incentives for specified productive conduct. See Fla Stat § 944.012 (1979). But none of these provisions for extra gain time compensates for the reduction of gain-time available solely for good conduct. The fact remains that an inmate who performs satisfactory work and avoids disciplinary violations could obtain more gain time per month under the repealed provision, § 944.27(1)(1975), than he could for the same conduct under the new provision, § 944.275(1)(1979). To make up the difference, the inmate has to satisfy the extra conditions specified by the discretionary gain-time provisions.[19] Even then, the award of the extra gain time is purely discretionary,

contingent on both the wishes of the correctional authorities and special behavior by the inmate, such as saving a life or diligent performance in an academic program. Fla Stat §§ 944.275(3)(a), (b) (1979). In contrast, under both the new and old statutes, an inmate is automatically entitled to the monthly gain time simply for avoiding disciplinary infractions and performing his assigned tasks. Compare Fla Stat § 944.275(1) (1979) with § 944.27(1) (1975).[20] Thus, the new provision constricts the inmate's

[450 US 36]

opportunity to earn early release, and thereby makes more onerous the punishment for crimes committed before its enactment. This result runs afoul of the prohibition against ex post facto laws.[21]

---

qualify under this previous provision due to "age, illness, infirmity, or confinement for reasons other than discipline," additional gain time of up to six days per month may be granted for "constructive utilization of time." § 944.275(2)(e).

**19.** In addition, few of the "new" sources for extra gain time do more than reiterate previous opportunities provided by statute or state regulation. Compare Fla Stat § 944.275(3)(a) (1979) with § 944.29 (1975) ("an extra goodtime allowance for meritorious conduct or exceptional industry"); Fla Stat § 944.275(2)(b) (1979) with § 944.27 (1975) (authorizing administrative rules governing additional gain time) and Fla Admin Code, Rule 10B-20.04(1) (1975) (gain time for construction labor project); Fla Stat § 944.275(3)(b) (1979) with Rule 10B-20.04(2) (1975) (gain time for outstanding deed). Moreover, under the statute in existence when petitioner's crime occurred, the Department of Corrections enjoyed greater discretion as to the reasons for awarding extra gain time, and as to the amount that could be awarded. See § 944.29 (1975).

**20.** As respondent put it, "all any prisoner had to do . . . was to stay out of trouble." Brief for Respondent 25. The monthly gaintime provision, both at the time of petitioner's offense and now, directed that the Department of Corrections "shall" award gain time to those who obey the rules and perform their work satisfactorily. Fla Stat § 944.27(1) (1975); Fla Stat § 944.275(1) (1979). The discretionary

extra gain time cannot fully compensate for the reduced accumulation of gain time for good behavior, for the discretionary credit is more uncertain. Cf. In re Medley, 134 US 160, 172, 33 L Ed 835, 10 S Ct 384 (1890) (rejecting nondisclosure of execution date as ex post facto increase of uncertainty and mental anxiety). Moreover, replacement of mandatory sentence reduction with discretionary sentence reduction cannot be permissible in light of Lindsey v Washington, 301 US 397, 401, 81 L Ed 1182, 57 S Ct 797 (1937). There, we rejected as an ex post facto violation a legislative change from flexible sentencing to mandatory maximum sentencing because the retrospective legislation restricted defendants' opportunity to serve less than the maximum time in prison.

**21.** We need not give lengthy consideration to respondent's claim that the challenged statute, Fla Stat § 944.275(1) (1979), is merely procedural because it does not alter the punishment prescribed for petitioner's offense. Brief for Respondent 13, 17–18. This contention is incorrect, given the uncontested fact that the new provision reduces the quantity of gain time automatically available, and does not merely alter procedures for its allocation. See supra, Part II-A. Respondent's reliance on a general sttement of legislative intent unrelated to the gain-time provision, see Brief for Respondent 17 (citing Fla Stat § 944.012(6) (1979)), is also unpersuasive.

### III

**[10a]** We find Fla Stat § 944.275(1) (1979) void as applied to petitioner, whose crime occurred before its effective date. We therefore reverse

the judgment of the Supreme Court of Florida and remand this case for further proceedings not inconsistent with this opinion.[22]

Reversed and remanded.

### SEPARATE OPINIONS

Justice **Blackmun,** with whom The **Chief Justice** joins, concurring in the judgment.

Were the Court writing on a clean slate, I would vote to affirm the judgment of the Supreme Court of Florida. My

[450 US 37]

thesis would be: (a) the 1978 Florida statute operates only prospectively and does not affect petitioner's credits earned and accumulated prior to the effective date of the statute; (b) "good time" or "gain time" is something to be earned and is not part of, or inherent in, the sentence imposed; (c) all the new statute did was to remove some of petitioner's hope and a portion of his opportunity; and (d) his sentence therefore was not enhanced by the statute. In addition, as the Court's 18th footnote reveals, ante, at 34–35, 67 L Ed 2d, at 26, the statutory change by no means was entirely restrictive; in certain respects it was more lenient, as the Court's careful preservation for this prisoner of the new statute's other provisions clearly implies. Ante, at 36 and this page, n 22, 67 L Ed 2d, at 28.

The Court's precedents, however,

particularly Lindsey v Washington, 301 US 397, 81 L Ed 1182, 57 S Ct 797 (1937), and the summary disposition of Greenfield v Scafati, 277 F Supp 644 (Mass 1967), affd, 390 US 713, 20 L Ed 2d 250, 88 S Ct 1409 (1968), although not warmly persuasive for me look the other way, and I thus must accede to the judgment of the Court.

Justice **Rehnquist,** concurring in the judgment.

I find this case a close one. As the Court recently noted: "It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." Dobbert v Florida, 432 US 282, 294, 53 L Ed 2d 344, 97 S Ct 2290 (1977). Petitioner was clearly disadvantaged by the loss of the opportunity to accrue gain time through good conduct pursuant to the 5-10-15 formula when the legislature changed to a 3-6-9 formula. The new statute, however, also afforded petitioner opportunities not available

[450 US 38]

under prior law to earn additional gain time beyond the good-conduct formula.[*] The case is not

---

**22. [10b]** The proper relief upon a conclusion that a state prisoner is being treated under an ex post facto law is to remand to permit the state court to apply, if possible, the law in place when his crime occurred. See Lindsey v Washington, supra, at 402, 81 L Ed 1182, 57 S Ct 797, In re Medley, supra, at 173, 33 L Ed 835, 10 S Ct 384. In remanding for this relief, we note that only the ex post facto portion of the new law is void as to petitioner, and therefore any severable provisions which are not ex post facto may still be applied to

him. See 2 C. Sands, Sutherland on Statutory Construction § 44.04 (4th ed 1973).

[*] While the Court points out that gain time was available under the old scheme beyond the 5-10-15 formula, ante, at 35, n 19, 67 L Ed 2d, at 27, I am not convinced that the new sources simply "reiterate[d]" opportunities previously available. There is, for example, no dispute that several of the new sources of gain time have no analogues in the previous

## WEAVER v GRAHAM
450 US 24, 67 L Ed 2d 17, 101 S Ct 960

resolved simply by comparing the 5-10-15 formula with the 3-6-9 formula. "We must compare the two statutory procedures in toto to determine if the new may be fairly characterized as more onerous." Ibid.

I am persuaded in this case, albeit not without doubt, that the new statute is more onerous than the old, because the amount of gain time which is accrued automatically solely through good conduct is substantially reduced, and this reduction is not offset by the availability of discretionary awards of gain time for activities extending beyond simply "staying out of trouble." This is not to say, however, that no reduction in automatic gain time, however slight, can ever be offset by increases in the availability of discretionary gain time, however great, or that reductions in the amount of credit for good conduct can never be offset by increases in the availability of credit which can be earned by more than merely good conduct.

Since the availability of new opportunities for discretionary gain time and the reduction in the amount of automatic gain time can be viewed as a total package, it must be emphasized,

[450 US 39]

that nothing in today's decision compels Florida to provide prisoners in petitioner's position with the benefits of the new provisions when this Court has held that Florida may not require such prisoners to pay the price. It is not at all clear that the Florida Legislature would have intended to make available the new discretionary gain time to prisoners earning automatic gain time under the old 5-10-15 formula, when the legislature in fact reduced the 5-10-15 formula when it enacted the new provisions. The question is, of course, one for Florida to resolve.

---

statutory or administrative scheme. See, e.g., Fla Stat § 944.275(2)(e) (1979) (up to six days of gain time per month because of age, illness, infirmity, or confinement for reasons other than discipline); § 944.275(3)(a) (up to six days per month for inmates who diligently participate in an approved course of academic or vocational study). Other new statutory provisions which had only administrative counterparts improved substantially on the availability of gain time. For example, under the old administrative system, an inmate could receive from 1 to 15 days of gain time per month for constructive labor, Fla Admin Code, Rule 10B-20.04(1) (1975), while under the new statutory scheme an inmate can receive up to 1 day of gain time for every day of constructive labor, Fla Stat § 944.275(2)(b) (1979).

# EXHIBIT

## 'C'

# EXHIBIT
# 'D'

*[378 US 347]
*SIMON BOUIE and Talmadge J. Neal, Petitioners,

v

COLUMBIA

378 US 347, 12 L ed 2d 894, 84 S Ct 1697

[No. 10]

Argued October 14 and 15, 1963.  Decided June 22, 1964.

### SUMMARY

Two Negroes refused to leave a booth in the restaurant department of a drugstore, although requested to do so by the store manager.  They were convicted in a South Carolina state court of having violated a statute making it a misdemeanor to enter another's lands after notice from the owner or tenant prohibiting such entry.  The Supreme Court of South Carolina affirmed.  (239 SC 570, 124 SE2d 332.)

On certiorari, the United States Supreme Court reversed.  In an opinion by BRENNAN, J., expressing the views of five members of the Court, it was held that the convictions violated the due process clause of the Fourteenth Amendment, in view of the fact that not until after the commission of the alleged offense the South Carolina Supreme Court construed the statute to cover the act of remaining on the premises after receiving notice to leave.

GOLDBERG, J., with the concurrence of WARREN, Ch. J., while joining in the opinion and judgment of the Court, would rest the reversal also on the reasons stated in his concurring opinion in Bell v Maryland, supra, p. 822.

DOUGLAS, J., would reverse for the reasons stated in his opinion in Bell v Maryland, supra, p. 822.

BLACK, J., joined by HARLAN and WHITE, JJ., dissented, expressing the view that no one could have been misled by the language of the statute into believing that it would permit him to stay on the property of another over the owner's protest without being guilty of trespass.

### HEADNOTES

Classified to U. S. Supreme Court Digest, Annotated

Constitutional Law § 854 — due process — criminal trespass
1. The due process clause of the Fourteenth Amendment is violated by state convictions of Negroes on charges of having refused to leave the restaurant department of a drugstore in violation of a statute which by its terms made it a criminal offense to enter lands of another after notice from the owner prohibiting such entry, but which, after the commission of

## BOUIE v COLUMBIA
### 378 US 347, 12 L ed 2d 894, 84 S Ct 1697
**895**

the alleged offense, was construed by the highest court of the state to cover the act of remaining on the premises after receiving notice to leave.

**Statutes § 18 — criminal — vagueness**

2. The constitutional requirement of definiteness is violated by a criminal statute which fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute; the underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

[*See annotation references* 1, 2]

**Statutes § 185 — criminal — judicial enlargement**

3. Judicial enlargement of a criminal statute by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness.

**Constitutional Law § 75 — ex post facto law — decisions of courts**

4. An unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Article 1, § 10, of the Federal Constitution forbids; the principle that the required criminal law must have existed when the conduct in issue occurred applies to bar retroactive criminal prohibitions emanating from courts as well as from legislatures.

**Constitutional Law § 73 — ex post facto laws**

5. An ex post facto law is one that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action, or one that aggravates a crime, or makes it greater than it was when committed.

**Constitutional Law § 831 — due process — judicial enlargement of criminal statute**

6. The standards of state decisional consistency underlying the rule that an unforeseeable and unsupported state court decision on a question of state procedure does not constitute an adequate ground to preclude United States Supreme Court review of a federal question are also applicable in determining whether a state court's construction of a criminal statute was so unforeseeable as to deprive the defendant of the fair warning to which the Federal Constitution entitles him.

**Constitutional Law § 786 — due process — retroactive denial of hearing**

7. A state court which overrules a consistent line of procedural decisions, with the retroactive effect of denying a litigant a hearing in a pending case, thereby deprives him of due process of law in its primary sense of an opportunity to be heard and to defend his substantive right.

**Constitutional Law § 513 — due process — violation by judiciary**

8. A violation of the due process clause may be accomplished by a state judiciary in the course of construing an otherwise valid state statute.

**Statutes § 18 — criminal — indefiniteness — tests**

9. The determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants; hence, it is immaterial that they acted with intent to be arrested.

[*See annotation references* 1, 2]

---

## ANNOTATION REFERENCES

1. Indefiniteness of language as affecting validity of criminal legislation. 96 L ed 374, 97 L ed 203.

2. Illustrations as to when statute defining criminal offense is subject to attack as vague, indefinite, or uncertain. 83 L ed 893.

**Appeal and Error § 1029 — evidence not in record**

10. On United States Supreme Court review of state trespass convictions, there is no basis for an inference that defendants intended to be arrested for violating the criminal trespass statute, either by remaining on the premises after being asked to leave or by any other conduct, where the record is silent as to what the defendants intended to be arrested for, and in fact they were arrested not for trespass but breach of the peace.

**Trespass §§ 1, 6 — civil and criminal liability distinguished**

11. The law of civil trespass is a field quite distinct and separate from criminal trespass.

**Trespass § 6 — criminal liability**

12. Unless a trespass is committed under such circumstances as to constitute an actual breach of the peace, it is not indictable at common law, but is to be redressed by a civil action only.

**Constitutional Law § 75 — judicial expansion of criminal statute — retroactivity**

13. The application of the rule that judicial expansion of a criminal statute, while valid in the future, may not be applied retroactively is particularly compelling where the defendant's conduct cannot be deemed improper or immoral.

**Statutes § 164 — determining meaning from language used**

14. The intention of the legislature is to be collected from the words they employ, and to determine that a case is within the intention of a statute, especially of a penal act, its language must authorize such a determination.

**Statutes § 185 — criminal — strict construction**

15. The principle that a case which is within the reason or mischief of a statute is within its provisions cannot be carried so far as to punish a crime not enumerated in a statute, because it is of equal atrocity, or of kindred character, with those which are enumerated.

### APPEARANCES OF COUNSEL

Jack Greenberg, Matthew Perry and Constance B. Motley argued the cause for petitioners.

David W. Robinson, II, and John W. Sholenberger argued the cause for respondent.

Ralph S. Spritzer argued the cause for the United States, amicus curiae, by special leave of Court.

Briefs of Counsel, p 1337, infra.

### OPINION OF THE COURT

*[378 US 348]

*Mr. Justice Brennan delivered the opinion of the Court.

This case arose out of a "sit-in" demonstration at Eckerd's Drug Store in Columbia, South Carolina. In addition to a lunch counter, Eckerd's maintained several other departments, including those for retail drugs, cosmetics, and prescriptions. Negroes and whites were invited to purchase and were served alike in all departments of the store with the exception of the restaurant department, which was reserved for whites. There was no evidence that any signs or notices were posted indicating that Negroes would not be served in that department.

On March 14, 1960, the petitioners, two Negro college students, took seats in a booth in the restaurant department at Eckerd's and waited to be served. No one spoke to them or approached them to take their orders for food. After they

were seated, an employee of the store put up a chain with a "no trespassing" sign attached. Petitioners continued to sit quietly in the booth. The store manager then called the city police department and asked the police to come and remove petitioners. After the police arrived at the store the manager twice asked petitioners to leave. They did not do so. The Assistant Chief of Police then asked them to leave. When petitioner Bouie asked "For what?" the Assistant Chief replied: "Because it's a breach of the peace . . . ." Petitioners still refused to leave, and were then arrested. They were charged with breach of the peace in violation of § 15–909, Code of Laws of South Carolina, 1952, but were not convicted. Peti-

*[378 US 349]

tioner Bouie was also charged *with resisting arrest, and was convicted, but the conviction was reversed by the State Supreme Court for insufficiency of evidence. Both petitioners were also charged with criminal trespass in violation of § 16–386 of the South Carolina Code of 1952 (1960 Cum Supp) ;[1] on this charge they were convicted, and their convictions were affirmed by the State Supreme Court over objections based upon the Due Process and Equal Protection Clauses of the Fourteenth Amendment. 239 SC 570, 124 SE2d 332. We granted certiorari to review the judgments affirming these trespass convictions. 374 US 805, 10 L ed 2d 1030, 83 S Ct 1690.

We do not reach the question presented under the Equal Protection Clause, for we find merit in petitioners' contention under the Due Process Clause and reverse the judgments on that ground.

Petitioners claim that they were denied due process of law either because their convictions under the trespass statute were based on no evidence to support the charge, see Thompson v Louisville, 362 US 199, 4 L ed 2d 654, 80 S Ct 624, 80 ALR2d 1355, or because the statute failed to afford fair warning that the conduct for which they have now been convicted had been made a crime. The terms of the statute define the prohibited conduct as "entry upon the lands of another . . . after notice from the owner or tenant prohibiting such entry . . . ."

*[378 US 350]

*See note 1, supra. Petitioners emphasize the conceded fact that they did not commit such conduct; they received no "notice . . . prohibiting such entry" either before they entered Eckerd's Drug Store (where in fact they were invited to enter) or before they entered the restaurant department of the store and seated themselves in the booth. Petitioners thus argue that, under the statute as written, their convictions would have to be reversed for want of evidence under the Thompson case. The argument is persuasive but beside the point, for the case in its present posture does not involve the statute "as written."

---

1. That section provides: *"Entry on lands of another after notice prohibiting same.*—Every entry upon the lands of another where any horse, mule, cow, hog or any other livestock is pastured, or any other lands of another, after notice from the owner or tenant prohibiting such entry, shall be a misdemeanor and be punished by a fine not to exceed one hundred dollars, or by imprisonment with hard labor on the public works of the county for not exceeding thirty days. When any owner or tenant of any lands shall post a notice in four conspicuous places on the borders of such land prohibiting entry thereon, a proof of the posting shall be deemed and taken as notice conclusive against the person making entry, as aforesaid for the purpose of trespassing".

Case 4:07-cv-06488-CW    Document 4    Filed 04/10/2008    Page 33 of 42

The South Carolina Supreme Court, in affirming petitioners' convictions, construed the statute to cover not only the act of entry on the premises of another after receiving notice not to enter, but also the act of remaining on the premises of another after receiving notice to leave.[2] Under the statute as so construed, it is clear that there was evidence to support petitioners' convictions, for they concededly remained in the lunch counter booth after being asked to leave. Petitioners contend, however, that by applying such a construction of the statute to affirm their convictions in this case, the State has punished them for conduct that

**Headnote 1**   was not criminal at the time they committed it, and hence has violated the requirement of the Due Process Clause that a criminal statute give fair warning of the conduct which it prohibits. We agree with this contention.

The basic principle that a criminal statute must give fair warning of the conduct that it *[378 US 351] makes a crime has

**Headnote 2**   *[378 US 351] often been recognized by this Court. As was said in United States v Harriss, 347 US 612, 617, 98 L ed 989, 996, 74 S Ct 808.

"The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man

shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

Thus we have struck down a state criminal statute under the Due Process Clause where it was not "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." Connally v General Const. Co. 269 US 385, 391, 70 L ed 322, 328, 46 S Ct 126. We have recognized in such cases that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law," ibid., and that "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." Lanzetta v New Jersey, 306 US 451, 453, 83 L ed 888, 890, 59 S Ct 618.[3]

It is true that in the Connally and Lanzetta cases, and in other typical applications of the principle, the uncertainty as to the statute's prohibition resulted from vague or overbroad language in the statute itself, and the Court concluded that the statute was "void for vagueness." The instant case seems distinguishable, since on its face the language of § 16–386 of the South Carolina Code was admirably nar-

---

2. This construction of the statute was first announced by the South Carolina Supreme Court in City of Charleston v Mitchell, 239 SC 376, 123 SE2d 512, decided on December 13, 1961, certiorari granted and judgment reversed, 378 US 551, 12 L ed 2d 1033, 84 S Ct 1901. In the instant case and in City of Columbia v Barr, 239 SC 395, 123 SE2d 521, reversed,

378 US 146, 12 L ed 2d 766, 84 S Ct 1734, the South Carolina Supreme Court simply relied on its ruling in Mitchell.

3. See also McBoyle v United States, 283 US 25, 27, 75 L ed 816, 818, 51 S Ct 340; United States v Cardiff, 344 US 174, 176–177, 97 L ed 200, 202, 73 S Ct 189; Pierce v United States, 314 US 306, 311, 86 L ed 226, 230, 62 S Ct 237.

BOUIE v COLUMBIA                    **899**

378 US 347, 12 L ed 2d 894, 84 S Ct 1697

row and precise; the statute applied only to "entry upon the lands of

*[378 US 352]

another . . . after *notice . . . prohibiting such entry . . . ." The thrust of the distinction, however, is to produce a potentially greater deprivation of the right to fair notice in this sort of case, where the claim is that a statute precise on its face has been unforeseeably and retroactively expanded by judicial construction, than in the typical "void for vagueness" situation. When a statute on its face is vague or overbroad, it at least gives a potential defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction. If the Fourteenth Amendment is violated when a person is required "to speculate as to the meaning of penal statutes," as in Lanzetta, or to "guess at [the statute's] meaning and differ as to its application," as in Connally, the violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question.

There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. As the Court recognized in Pierce v United States, 314 US 306, 311, 86 L ed 226, 231, 62 S Ct 237, "judicial enlargement of a criminal Act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness." Even where vague statutes are concerned, it has been pointed out that the vice in such an enactment cannot "be

*[378 US 353]

cured in a given *case by a construction in that very case placing valid limits on the statute." for "the objection of vagueness is twofold: inadequate guidance to the individual whose conduct is regulated, and inadequate guidance to the triers of fact. The former objection could not be cured retrospectively by a ruling either of the trial court or the appellate court, though it might be cured for the future by an authoritative judicial gloss. . . ." Freund, The Supreme Court and Civil Liberties, 4 Vand L Rev 533, 541 (1951). See Amsterdam, Note, 109 U Pa L Rev 67, 73–74, n 34.

If this view is valid in the case of a judicial construction which adds a "clarifying gloss" to a vague statute, id., at 73, making it narrower or more definite than its language indicates, it must be a fortiori so where the construction unexpectedly broadens a statute which on its face had been definite and precise. Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art I, § 10, of the Constitution forbids. An ex post facto law has been defined by this Court as one "that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action," or "that *aggravates* a *crime*, or

**Headnote 3**

**Headnote 4**
**Headnote 5**

makes it *greater* than it was, when committed." Calder v Bull, 3 Dall 386, 390, 1 L ed 648, 650.[4] If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achiev-

*[378 US 354]

ing precisely the \*same result by judicial construction. Cf. Smith v Cahoon, 283 US 553, 565, 75 L ed 1264, 1273, 51 S Ct 582. The fundamental principle that "the required criminal law must have existed when the conduct in issue occurred," Hall, General Principles of Criminal Law (2d ed 1960), at 58–59, must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a criminal statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," it must not be given retroactive effect. Id., at 61.

The basic due process concept involved is the same as that which the Court has often applied in holding that an unforeseeable and unsupported state-court decision on a question of state procedure does not constitute an adequate ground to preclude this Court's review of a federal question. See e. g., Wright v Georgia, 373 US 284, 291, 10 L ed 2d 349, 354, 83 S Ct 1240; NAACP v Alabama, 357 US 449, 456–458, 2 L ed 2d 1488, 1496, 1497, 78 S Ct 1163; Barr v City of Columbia, 378 US 146, 12 L ed 2d 766, 84 S Ct 1734. The standards of state decisional consistency applicable in judging

**Headnote 6**

the adequacy of a state ground are also applicable, we think, in determining whether a state court's construction of a criminal statute was so unforeseeable as to deprive the defendant of the fair warning to which the Constitution entitles him. In both situations, "a federal right turns upon the status of state law as of a given moment in the past—or, more exactly, the appearance to the individual of the status of state law as of that moment . . . ." 109 U Pa L Rev, supra, at 74, n 34. When a state court overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case, it thereby deprives him of due process of law "in its primary sense of an opportunity to be heard and to defend [his] substantive right." Brinkerhoff-Faris Trust & Sav. Co. v Hill, 281 US 673, 678, 74 L ed 1107, 1112, 50 S Ct 451. When a similarly unforeseeable state-court construction of a criminal statute is applied retroac-

**Headnote 7**

*[378 US 355]

tively to subject a person \*to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime. Applicable to either situation is this Court's statement in Brinkerhoff-Faris, supra, that "if the result above stated were attained by an exercise of the State's legislative power, the transgression of the due process clause of the Fourteenth Amendment would be obvious," and "The violation is none the less clear when that

**Headnote 8**

---

4. Thus, it has been said that "No one can be criminally punished in this country, except according to a law prescribed for his government by the sovereign authority before the imputed offense was committed, and which existed as a law at the time."

Kring v Missouri, 107 US 221, 235, 27 L ed 506, 511, 2 S Ct 443. See Fletcher v Peck, 6 Cranch 87, 138, 3 L ed 162, 178; Cummings v Missouri, 4 Wall 277, 325–326, 18 L ed 356, 363, 364.

result is accomplished by the state judiciary in the course of construing an otherwise valid . . . state statute." Id., at 679–680, 74 L ed at 1112, 1113.

Applying those principles to this case, we agree with petitioners that **Headnote 1** § 16–386 of the South Carolina Code did not give them fair warning, at the time of their conduct in Eckerd's Drug Store in 1960, that the act for which they now stand convicted was rendered criminal by the statute. By its terms, the statute prohibited only "entry upon the lands of another . . . after notice from the owner . . . prohibiting such entry . . . ." There was nothing in the statute to indicate that it also prohibited the different act of remaining on the premises after being asked to leave. Petitioners did not violate the statute as it was written; they received no notice before entering either the drug store or the restaurant department. Indeed, they knew they would not receive any such notice before entering the store, for they were invited to purchase everything except food there. So far as the words of the statute were concerned, petitioners were given not only no "fair warning," but no warning whatever, that their conduct in Eckerd's Drug Store would violate the statute.[5]

*[378 US 356]
*The interpretation given the statute by the South Carolina Supreme Court in the Mitchell case, note 2, supra, so clearly at variance with the statutory language, has not the slightest support in prior South Carolina decisions. Far from equating entry after notice not to enter with remaining on the premises after notice to leave, those decisions emphasized that proof of notice before entry was necessary to sustain a conviction under § 16–386. Thus in State v Green, 35 SC 266, 14 SE 619 (1892), the defendant was apparently in possession of the land when he was told to leave. Yet the prosecution was not for remaining on the land after such notice but for returning later, and the court said, "under the view we take of this provision of our laws, when the owner or tenant in possession of land forbids entry thereon, any person with notice who afterwards enters such premises is liable to punishment." 35 SC at 268, 14 SE at 620. In State v Cockfield, 15 Rich Law (SC) 53, 55 (1867), the court, after quoting the statute's provision (as it then read) that "Every entry on the inclosed or uninclosed lands of another, after notice from the owner or tenant, prohibiting the same, shall be deemed a misdemeanor," stated that this language "will not permit the Court to suppose that it was intended to have any other than the ordinary acceptation." See also State v Mays, 24 SC 190 (1885); State v Tenny, 58 SC 215, 36 SE 555 (1900); State v Olasov, 133 SC 139, 130 SE 514 (1925). In sum,

5. We think it irrelevant that petitioners at one point testified that they had intended to be arrested. The **Headnote 9** **Headnote 10** determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants. But apart from that, the record is silent as to what petitioners intended to be arrested for, and in fact what they *were* arrested for was not trespass but breach of the peace—on which charge they were not convicted. Hence there is no basis for an inference that petitioners intended to be arrested *for violating this statute*, either by remaining on the premises after being asked to leave or by any other conduct.

in the 95 years between the enactment of the statute in 1866 and the 1961 decision in the Mitchell case, the South Carolina cases construing the statute uniformly emphasized *[378 US 357] *the notice-before-entry requirement, and gave not the slightest indication that that requirement could be satisfied by proof of the different act of remaining on the land after being told to leave.

In holding in Mitchell that "entry . . . after notice" includes remaining after being asked to leave, the South Carolina Supreme Court did not cite any of the cases in which it had previously construed the same statute. The only two South Carolina cases it did cite were simply irrelevant; they had nothing whatever to do with the statute, and nothing to do even with

Headnote 11 the general field of criminal trespass, involving instead the law of *civil* trespass— which has always been recognized, by the common law in general and by South Carolina law in particular, as a field quite distinct and separate from criminal trespass. Shramek v Walker, 152 SC 88, 149 SE 331 (1929), was an action for damages for an assault and battery committed by a storekeeper upon a customer who refused to leave the store after being told to do so; the defense was that the storekeeper was entitled to use reasonable force to eject an undesirable customer. The validity of such a defense was recognized, the court stating that "while the entry by one person on the premises of another may be lawful, by reason of express or implied invitation to enter, his failure to depart, on the request of the owner, will make him a trespasser and justify the owner in using reasonable force to eject him." 152 SC at 99–100, 149 SE at 336. State v Williams,

76 SC 135, 56 SE 783 (1907), was a murder prosecution in which the defense was similarly raised that the victim was a trespasser against whom the defendant was entitled to use force, and the court approved the trial judge's instruction that a person remaining on another's premises after being told to leave is a trespasser and may be ejected by reasonable force. 76 SC at 142, 56 SE at 785.

Both cases thus turned wholly upon tort principles. For that reason they had no relevance whatever, *[378 US 358] under *South Carolina law prior to the Mitchell case, to § 16–386 in particular or to criminal trespass in general. It is one thing to say that a person remaining on another's land after being told to leave may be ejected with reasonable force or sued in a civil action, and quite another to say he may be convicted and punished as a criminal. The clear distinction between civil and criminal trespass is well recognized in the common law. Thus it is stated, in 1 Bishop, Criminal Law, § 208 (9th ed 1923) that "In civil jurisprudence, when a man does a thing by permission and not by license, and, after proceeding lawfully part way, abuses the liberty the law had given him, he shall be deemed a trespasser from the beginning by reason of this subsequent abuse. But this doctrine does not prevail in our criminal jurisprudence; for no man is punishable criminally for what was not criminal when done, even though he afterward adds either the act or the intent, yet not the two together." Unless a trespass is "committed under such circumstances as to con-

Headnote 12 stitute an *actual* breach of the peace, it is not indictable at common law, but is to be redressed by a civil ac-

12 L ed 2d

907), was
which the
aised that
er against
is entitled
t approved
ion that a
 another's
d to leave
be ejected
SC at 142,


ed wholly
r that rea-
 whatever,

.w prior to
16–386 in
il trespass
ing to say
ig on an-
old to leave
reasonable
tion, and
ily be con-
riminal.
en civil
l recog-
Thus it
Law,
civil
a
li-
law-
berty
l be
be-
uent
not
ru-
le
n-
e
or
d
n-
ch
n-

tion only." Clark and Marshall, Crimes (5th ed 1952), at 607.[6] There is no reason to doubt that, until the Mitchell case, this basic distinction was recognized in South Carolina itself. In State v Cargill, 2 Brev 114 (1810), the South Carolina Supreme Court reversed a conviction for forcible entry, saying "If the prosecutor had a better right to the possession than the defendant, he might have availed himself of his civil remedy. *The law will not punish, criminally, a private injury of this nature.* [378 US 359] *There must be, at least, some appearance of force, by acts, words, or gestures, to constitute the offence charged." Id., at 115. (Italics added.)

Under pre-existing South Carolina law the two cases relied on by the State Supreme Court were thus completely unrelated, not only to this particular statute, but to the entire field of criminal trespass. The pre-existing law gave petitioners no warning whatever that this criminal statute would be construed, despite its clear language and consistent judicial interpretation to the contrary, as incorporating a doctrine found only in civil trespass cases.[7]

The South Carolina Supreme

Court in Mitchell also cited North Carolina decisions in support of its construction of the statute. It would be a rare situation in which the meaning of a statute of another State sufficed to afford a person "fair warning" that his own State's [378 US 360] statute *meant something quite different from what its words said. No such situation is presented here. The meaning ascribed by the North Carolina Supreme Court to the North Carolina criminal trespass statute—also a ruling first announced in a "sit-in" case of recent vintage—was expressly based on what criminal trespass cases in North Carolina had "repeatedly held." State v Clyburn, 247 NC 455, 462, 101 SE2d 295, 300 (1958). As was demonstrated above, South Carolina's criminal trespass decisions prior to Mitchell had "repeatedly held" no such thing, nor had they even intimated the attribution of such a meaning to the words "entry . . . after notice" in § 16–386. Moreover, if the law of other States is indeed to be consulted, it is the prior law of South Carolina, not the law first announced in Mitchell, that is consonant with the traditional interpretation of similar "entry . . . after notice" statutes by

---

6. Accord, Krauss v State, 216 Md 369, 140 A2d 653 (1958); 2 Wharton, Criminal Law and Procedure, § 868 (1957); Hochheimer, Law of Crimes and Criminal Procedure, §§ 327–329 (2d ed).

7. Indeed, it appears that far from being understood to incorporate a doctrine of civil trespass, § 16–386 is considered in South Carolina not to incorporate *any* common law of trespass, either criminal or civil—in other words, not to be a "trespass" statute at all. South Carolina has long had on its books, side by side with § 16–386, a statute that does deal eo nomine with "trespass"; § 16–382 makes it unlawful to "wilfully, unlawfully and maliciously . . . commit any . . . trespass upon real property in the possession of another . . . ." When South Carolina in 1960 enacted legislation dealing specifi-

cally with a refusal to leave upon request (thus filling the gap which the South Carolina Supreme Court has filled by judicial construction in Mitchell and in this case), it apparently gave express recognition to the distinction between the two statutes, declaring that "The provisions of this section shall be construed as being in addition to, and not as superseding, any other statutes of the State relating to trespass or entry on lands of another." South Carolina Code of 1962, § 16–388. Thus it would seem that § 16–386 is regarded by state law as dealing not with "trespass," but rather with the distinct offense of "entry on lands of another" after notice not to enter. The contention that the statute was understood to incorporate a doctrine of civil trespass law is therefore all the more untenable.

other state courts. Thus in Goldsmith v State, 86 Ala 55, 5 So 480 (1889), the Alabama court construed § 3874 of the Alabama Code of 1887, imposing criminal penalties on one who "enters . . . after having been warned . . . not to do so," and held that "There must be a warning first, and an entry afterwards. One already in possession, even though a trespasser, or there by that implied permission which obtains in society, can not, by a warning then given, be converted into a violator of the statute we are construing, although he may violate some other law, civil or criminal." 86 Ala at 57, 5 So at 480–481.[8]

In Martin v City of Struthers, 319 US 141, 147, 87 L ed 1313, 1319, 63 S Ct 862, 882, this Court noted that "Traditionally the American law *[378 US 361] punishes *persons who enter onto the property of another after having been warned by the owner to keep off." Section 16–386 of the South Carolina Code is simply an example of this "traditional American law." In construing such statutes, other state courts have recognized that they apply only to "entry onto" the property of another after notice not to enter, and have not interpreted them to cover also the distinct act of remaining on the property after notice to leave. The South Carolina Supreme Court's retroactive application of such a construction here is no less inconsistent with the law of other States than it is with the prior case law of South Carolina and, of course, with the language of the statute itself.

Our conclusion that petitioners had no fair warning of the criminal

prohibition under which they now stand convicted is confirmed by the opinion held in South Carolina itself as to the scope of the statute. The state legislature was evidently aware of no South Carolina authority to the effect that remaining on the premises after notice to leave was included within the "entry after notice" language of § 16–386. On May 16, 1960, shortly after the "sit-in" demonstration in this case and prior to the State Supreme Court's decision in Mitchell, the legislature enacted § 16–388 of the South Carolina Code, expressly making criminal the act of failing and refusing "to leave immediately upon being ordered or requested to do so." Similarly, it evidently did not occur to the Assistant Chief of Police who arrested petitioners in Eckerd's Drug Store that their conduct violated § 16–386, for when they asked him why they had to leave the store, he answered, "Because it's a breach of the peace . . . ." And when he was asked further whether he was assisting the drugstore manager in ousting petitioners, he answered that he was not, but rather that "My purpose was that they were creating a disturbance there in the store, a breach of the peace in *[378 US 362] my *presence, and that was my purpose." It thus appears that neither the South Carolina Legislature nor the South Carolina police anticipated the present construction of the statute.

We think it clear that the South Carolina Supreme Court, in applying its new construction of the statute to affirm these convictions, has deprived petitioners of rights guaranteed to them by the Due Process

**Headnote 1**

8. See Pennsylvania R. Co. v Fucello, 91 NJL 476, 477, 103 A 988 (1918); Commonwealth v Richardson, 313 Mass 632, 48 NE 2d 678 (1943); Brunson v State, 140 Ala 201, 203, 37 So 197, 198 (1904).

## BOUIE v COLUMBIA

**378 US 347, 12 L ed 2d 894, 84 S Ct 1697**

Clause. If South Carolina had applied to this case its new statute prohibiting the act of remaining on the premises of another after being asked to leave, the constitutional proscription of ex post facto laws would clearly invalidate the convictions. The Due Process Clause compels the same result here, where the State has sought to achieve precisely the same effect by judicial construction of the statute. While such a construction is of course **Headnote 13** valid for the future, it may not be applied retroactively, any more than a legislative enactment may be, to impose criminal penalties for conduct committed at a time when it was not fairly stated to be criminal. Application of this rule is particularly compelling where, as here, the petitioners' conduct cannot be deemed improper or immoral. Compare McBoyle v United States, 283 US 25, 75 L ed 816, 51 S Ct 340.[9]

In the last analysis the case is controlled, we think, by the principle which Chief Justice Marshall stated for the Court in United States v Wiltberger, 5 Wheat 76, 96, 5 L ed 37, 42:

"The case must be a strong one indeed, which would jus- **Headnote 14** tify a Court in departing **Headnote 15** *[378 US 363] from the plain *meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorise us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated. . . ."

The crime for which these petitioners stand convicted was "not enumerated in the stat- **Headnote 1** ute" at the time of their conduct. It follows that they have been deprived of liberty and property without due process of law in contravention of the Fourteenth Amendment.

Reversed.

Mr. Justice **Goldberg**, with whom the **Chief Justice** joins, would, while joining in the opinion and judgment of the Court, also reverse for the reasons stated in the concurring opinion of Mr. Justice **Goldberg** in Bell v Maryland, 378 US 286, 12 L ed 2d 832.

Mr. Justice **Douglas** would reverse for the reasons stated in his opinion in Bell v Maryland, 378 US 242, 12 L ed 2d 867.

## SEPARATE OPINION

Mr. Justice **Black**, with whom Mr. Justice **Harlan** and Mr. Justice **White** join, dissenting.

This case arose out of a "sit-in" demonstration which took place at Eckerd's Drug Store in Columbia, South Carolina. The petitioners, two Negro college students, went to

---

9. See Freund, 4 Vand L Rev, supra, at 540: "In applying the rule against vagueness or overbreadth something . . . should depend on the moral quality of the conduct. In order not to chill conduct within the protection of the Constitution and having a genuine social utility, it may be necessary to throw the mantle of protection beyond the constitutional periphery, where the statute does not make the boundary clear."

the store, took seats in a booth in the restaurant department, and waited to be served. The store's policy was to sell to Negroes as well as whites in all departments except the restaurant. After petitioners sat down, a store employee put up a chain with *[378 US 364] a "no trespassing" *sign attached. Petitioners nevertheless continued to sit quietly in the booth. The store manager then called the city police department and asked the police to come and remove petitioners. After the police arrived at the store the manager twice asked petitioners to leave. They did not do so. The Chief of Police then twice asked them to leave. When they again refused, he arrested them both. They were charged with criminal trespass in violation of § 16–386 of the South Carolina Code,[1] tried in Recorder's Court, and found guilty.[2] On appeal the County Court in an unreported opinion affirmed the convictions. Petitioners then appealed to the Supreme Court of South Carolina, which likewise affirmed over petitioners' objections that by convicting them the State was denying them due process of law and equal protection of the laws as guaranteed by the Fourteenth Amendment. 239 *[378 US 365] SC 570, 124 SE2d 332. This *Court granted certiorari to consider these questions. 374 US 805, 10 L ed 2d 1030, 83 S Ct 1690.

It is not contradicted that the store manager denied petitioners service and asked them to leave only because of the store's acknowledged policy of not serving Negroes in its restaurant. Apart from the fact that they remained in the restaurant after having been ordered to leave, petitioners' conduct while there was peaceful and orderly. They simply claimed that they had a right to be served; the manager insisted, as the State now insists, that he had a legal right to choose his own customers and to have petitioners removed from the restaurant after they refused to leave at his request. We have stated today in Bell v Maryland, 378 US 318, 12 L ed 2d 351, our belief that the Fourteenth Amendment does not of its own force compel a restaurant owner to accept customers he does not want to serve, even though his reason for refusing to serve them may be his racial prejudice, adherence to local custom, or what he conceives to be his economic self-interest, and that the arrest and conviction of a person for trespassing in a restaurant under such circumstances is not the kind of "state action" forbidden by the Fourteenth Amendment. Here as in the Bell case there was, so far as has been pointed out to us, no city ordinance, official utterance, or state law of any kind tending to prevent Eckerd's from serving these

---

1. Section 16–386, Code of Laws of South Carolina, 1952 (1960 Supp), provides:

"*Entry on lands of another after notice prohibiting same.*—Every entry upon the lands of another where any horse, mule, cow, hog or any other livestock is pastured, or any other lands of another, after notice from the owner or tenant prohibiting such entry, shall be a misdemeanor and be punished by a fine not to exceed one hundred dollars, or by imprisonment with hard labor on the public works of the county for not exceeding thirty days. When any owner or tenant of any lands shall post a notice in four conspicuous

places on the borders of such land prohibiting entry thereon, a proof of the posting shall be deemed and taken as notice conclusive against the person making entry as aforesaid for the purpose of trespassing."

2. Both petitioners were also charged with breach of the peace in violation of § 15–909, Code of Laws of South Carolina, 1952, but were not convicted. Petitioner Bouie in addition was charged with and convicted of resisting arrest; that conviction was affirmed by the County Court but reversed by the State Supreme Court for insufficiency of evidence.

petitioners had it chosen to do so. Compare Robinson v Florida, 378 US 153, 12 L ed 2d 771, 84 S Ct 1693; Lombard v Louisiana, 373 US 267, 10 L ed 2d 338, 83 S Ct 1122; Peterson v City of Greenville, 373 US 244, 10 L ed 2d 323, 83 S Ct 1119. On the first question here raised, therefore, our opinion in Bell v Maryland is for us controlling.

Petitioners also contend that they were denied due process of law either because their conviction under the trespass statute was based on no evidence to support the charge, cf. Thompson v City of *[378 US 366] Louisville, 362 US *199, 4 L ed 2d 654, 80 S Ct 624, 80 ALR2d 1355, or because that statute as applied was so vague and indefinite that it failed to furnish fair warning that it prohibited a person who entered the property of another without notice not to do so from remaining after being asked to leave, cf. Edwards v South Carolina, 372 US 229, 9 L ed 2d 697, 83 S Ct 680; Cantwell v Connecticut, 310 US 296, 84 L ed 1213, 60 S Ct 900, 128 ALR 1352; Lanzetta v New Jersey, 306 US 451, 83 L ed 888, 59 S Ct 618. Under the State Supreme Court's construction of the statute, it is clear that there was evidence to support the conviction. There remains to be considered, therefore, only the vagueness contention, which rests on the argument that since the statutory language forbids only "entry upon the lands of another . . . after notice . . . prohibiting such entry," the statute cannot fairly be construed as prohibiting a person from remaining on property after notice to leave. We voted to sustain a Maryland trespass statute[a] against an identical challenge in Bell v Maryland, supra. While there is some difference in the language of the South Carolina and Maryland statutes—the Maryland statute prohibited entering or crossing over the lands of another after notice not to do so, while South Carolina's statute speaks only of entry and not of crossing over—this distinction has no relevance to the statute's prohibition against remaining after being asked to leave. In holding that the South Carolina statute forbids remaining after having been asked to leave as well as entry after notice not to do so, the South Carolina courts relied in part on the fact that it has long been accepted as the common law of that State that a person who enters upon the property of another by invitation becomes a trespasser if he refuses to leave when asked to do so. See, e.g., Shramek v Walker, 152 SC 88, 149 SE 331 (1929); State v Williams, 76 SC 135, 142, 56 SE 783, 785 (1907); State v Lazarus, 1 Mill Const. 34 *[378 US 367] (1817). We cannot *believe that either the petitioners[4] or anyone else could have been misled by the language of this statute into believing that it would permit them to stay on the property of another over the owner's protest without being guilty of trespass.

We would affirm.

---

3. Md Code, Art 27, § 577.

4. The petitioners testified that they had agreed the day before to "sit in" at the drugstore restaurant. One petitioner said that he had intended to be arrested; the other said that he had the same purpose "if it took that."